HIBERNIA BANK & TRUST CO. *v.* TURNER *et ux.*

(Division B.    March 31, 1930.)

[127 So. 292.    No. 28480.]

Shands, Elmore & Causey, of Cleveland, for appellant.

844

Cutrer & Smith, of Clarksdale, and Louis C. Hallam, of Jackson, for appellees.

Argued orally by **G. D. Shands**, for appellant, and by **E. A. Smith**, for appellees.

**Anderson, J.,** delivered the opinion of the court.

Appellant, a banking corporation under the laws of the state of Louisiana, filed the bill in this case against

T. M. Turner and his wife, Katherine M. Turner, in the second judicial district of Bolivar county, to recover from the appellee an indebtedness of one thousand six hundred twenty dollars and interest, and ten per cent attorney's fee, evidenced by appellees' promissory note owned by appellant, and to assert and establish a lien upon a diamond ring, which appellees had pledged as collateral for the payment of the note, and to have the ring sold to satisfy the indebtedness found to be due. A trial was had on original bill, appellees' answer and cross-bill, and appellant's answer to the cross-bill, and proofs, resulting in a decree in favor of appellant against appellees for the amount of the indebtedness, with interest and attorney's fees; and against appellant, in favor of appellees, for the value of the diamond ring which had been pledged by appellees to secure the payment of the note; and fixing the value of the ring, which was more than the indebtedness; and giving appellees a decree over against appellant for the difference. From that decree appellant prosecutes this appeal.

The ring pledged to secure the indebtedness was stolen between the time of the filing of the original bill in this cause and appellee's answer and cross-bill. The main question in the case was whether the loss of the value of the diamond ring should fall upon appellant or upon appellees. The court held that it should fall upon appellant. The question turns upon whether or not the ring was lost through the negligence of appellant.

The controlling facts of the case were either undisputed or supported by sufficient evidence to justify their finding as facts by the chancellor. They were as follows: During the latter part of the year 1919 appellee T. M. Turner purchased from T. J. Burke, then cashier of the Planters' Bank at Shaw, the diamond ring involved; the agreed price was three thousand dollars, and the mounting of the ring cost one hundred dollars more. The stone was large, weighing something like four and eighty-five

hundredths carats, and of very fine quality—a blue white, perfect stone. All the purchase price was paid in cash except one thousand two hundred dollars, and that sum Turner borrowed from the Planters' Bank at Burke's suggestion, giving therefor a note signed by himself and his wife, and to secure the note pledged with the bank the diamond ring. The note sued on in this case was given in renewal of that note to the bank, the amount of the renewal note being one thousand six hundred twenty dollars, which included accumulated interest. The note was dated December 1, 1923, and matured December 1, 1924. Appellee paid the interest on the note to January 1, 1925. About the time of the execution of the note sued on, Burke, cashier of the Planters' Bank, allowed Turner to take the ring and wear it for a while; later he had him return it to the bank, because the directors and officers of the bank required that this be done, fearing that it might be lost.

Appellant acquired the note sued on, and the diamond ring held as collateral, shortly after the 1st day of February 1925. The Planters' Bank soon thereafter ceased business, and went into liquidation. The Delta Bank was organized in its place, and took over all its assets, and the building in which it did business. Thereafter the Delta Bank conducted a banking business in Shaw, in the Planters' Bank building, using the same safe and vault, and, to a large extent, the same equipment, which had been used by that bank. The diamond ring was kept by the Planters' Bank in the time lock safe, in a secret drawer. When appellant acquired the note sued on, it left the diamond ring with the Planters' Bank, instead of having it sent to their banking house in New Orleans. When the Delta Bank took over the building and safe and equipment of the Planters' Bank, the ring was still in the safe under the time lock in the secret drawer.

Burke was retained as cashier of the Delta Bank. On December 9, 1925, the safe of the Delta Bank was bur-

glarized, and the ring and six thousand seven hundred fourteen dollars in money stolen. The burglary and larceny was committed by some one who knew how to unlock the safe, for the evidence showed, without conflict, that no violence was done to either the vault or the safe. In less than a month before the burglary and larceny Burke, the cashier of the Delta Bank, either resigned his position as cashier or was discharged. Shortly thereafter J. W. Paul was elected cashier in Burke's place. Only three persons knew the combination to the safe—Burke, the former cashier, Paul, the new cashier, and the bookkeeper, Rex Morgan. On several occasions before the burglary and larceny occurred, Paul requested the officers of the bank to have the combination on the safe changed, but this was not done. The combination remained as it was while Burke was cashier. Both Paul and Morgan testified that they did not take the ring. Burke was out of the state when the cause was tried, and his testimony was not taken in the form of a deposition.

When appellant acquired the note sued on, it knew that the ring was in the safe of the Planters' Bank. It knew, also, that later the Delta Bank had taken over the building, assets, and equipment, including the vault and safe of the Planters' Bank, and knew that the diamond ring was still in the safe, where it had been before this change. J. P. Sharpe was the agent of appellant to collect the Turner note, as well as other notes belonging to appellant. He knew that Burke had gone out of the Delta Bank as cashier, and that Paul had succeeded him. After this change in cashiers was made, Sharpe asked to see the ring in the safe, and was permitted by Paul, the new cashier of the Delta Bank, to do so.

The bill in this case was filed July 18, 1925. The burglary, resulting in the loss of the ring, took place on December 9, 1925. Appellees filed their answer and cross-bill on December 15, 1926, admitting the indebtedness sued on; but their cross-bill charged that the loss of the

ring had occurred through appellant's negligence—that the value of the ring was four thousand four hundred sixty-five dollars; and prayed a decree over against appellant for the difference between the indebtedness, interest, and attorney's fees, and the value of the ring.

Appellees pledged the diamond ring to the Planters' Bank, as security for their note. Thereupon the Planters' Bank became the bailee of the ring for hire. The relation of pledgor and pledgee arose. Such pledgee is a trustee for the pledgor, first, to pay the debt, and, second, to pay over the surplus of the pledge to the pledgor; and he cannot deal with the property so as to destroy or even to impair its value. Boswell v. Thigpen, 75 Miss. 308, 22 So. 823; Eckert v. Searcy, 114 Miss. 150, 74 So. 818; McLemore v. Hawkins, 46 Miss. 715. In the latter case the court used this language: "This brings us to consider the relations of pledgor and pledgee, and their respective rights. . . . The pledgor remains owner of the thing, whether a chattel or negotiable paper, and the pledgee, with whom is the possession, must use the care and diligence with respect to the thing, *according to its nature*, which men of ordinary prudence bestow about their own affairs." (Italics ours.) A pledgee by contract is a compensated bailee. The pledgee's duties and liabilities are those of ordinary bailee for hire. Such a pledgee is liable for ordinary negligence resulting in the loss of the pledge. The diligence required of a pledgee in the care of the pledge necessarily depends largely upon the character of the thing pledged and the surrounding circumstances, as well as the means of protection possessed by the pledgee. The pledgee is bound to exercise the degree of care which an ordinarily prudent man bestows upon his own property of like nature, and under like circumstances. The pledgee impliedly agrees that he has and will use such care, skill, and diligence; and his failure to use it is negligence, for which he is responsible. The pledgee must be a prudent adminis-

trator, although he is not an insurer. In case the pledge is stolen from the pledgee, that fact establishes neither responsibility nor lack of responsibility on his part. The controlling inquiry is still one of negligence. In determining the question of his responsibility, all the surrounding facts and circumstances of the particular case must be considered. 21 R. C. L. 664-665. The pledgee of property has control of it for the time being. He represents not only his own interest, but that of the pledgor, in taking the necessary action for its preservation and the collection and care of its proceeds. 21 R. C. L. 666.

Where the principal debt is assigned, and collateral delivered with it, the purchaser steps into the shoes of the seller. He is charged with the same duty respecting the pledge, and entitled to the same benefits therein, as the assignor. The right to subject the pledge to the payment of the debt, on default by the pledgor, passes with the transfer to the assignee—and this is true, even though the assignor retains possession of the pledge. Such possession is in the nature of a trust for the benefit of the assignee of the debt. 21 R. C. L. 673.

The question as to what constitutes ordinary care in a particular case materially depends upon the nature and value of the thing pledged, "the convenience of its being made secure, and its liability to loss, theft or injury. What would be simple negligence as to one thing might be gross negligence as to another. What would be ordinary care in relation to a pound of nails would be gross negligence in relation to a like weight of gold coin. So what might be proper care in mending a plow might be the grossest negligence as to the repair of a watch." 3 R. C. L. 98; Story on Bailments, secs. 15 and 186.

In leaving the ring with the Delta Bank for safe-keeping, appellant made that bank its bailee—a gratuitous bailee, not a bailee for hire; and therefore there was imposed upon it a lesser degree of care than was imposed

on appellant. But, as between appellees and appellant, the latter must suffer the loss of the ring if its bailee, the Delta Bank, failed to use ordinary care for its preservation. In other words, appellant was responsible to appellees for the fault of its gratuitous bailee, notwithstanding the gratuitous bailee might not be responsible to appellant.

We are of opinion that there was sufficient evidence to justify the chancellor in finding that the ring was lost because of appellant's failure to exercise ordinary care for its preservation. Appellant's failure to take the ring, and keep it in its banking house in New Orleans, and, instead of doing so, permitting it to remain in the safe of the Planters' Bank, and in the safe of the Delta Bank, the successor to the Planters' Bank, both of which banks were mere gratuitous bailees, in connection with the fact that the Delta Bank failed to have the combination to its safe changed, on demand of Paul, its cashier, which failure, as between appellant and appellees, is chargeable to the former, because in the care and preservation of the ring the Delta Bank was acting as the agent of appellant, and not of appellees—this, we think, constitutes sufficient facts and circumstances to justify the decree of the chancellor holding that the ring was lost through appellant's failure to exercise that degree of care required of it by law.

Appellant assigns as error that part of the decree of the court fixing the value of the ring. Necessarily, to ascertain the value of such property requires rather a wide range of inquiry—a much wider range than is necessary to ascertain the value of personal property daily quoted in the markets of the country. We deem it sufficient to say that the evidence of the expert witness, Hefferman, taken in connection with the other evidence in the case, bearing on the question, was sufficient to justify the finding of the chancellor as to the value of the ring. We cannot say that such finding was against the over-

whelming weight of the evidence, and, unless that can be said, the decree of the chancellor will not be overturned.

Affirmed.